William L. Mentlik
Roy H. Wepner
Aaron S. Eckenthal
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:   908.654.7866

*Attorneys for Plaintiff City of Homestead, Florida*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CITY OF HOMESTEAD, FLORIDA, on behalf of itself and all others similarly situated, | : | **Document Filed Electronically** |
| | : | |
| | : | Civil Action No. |
| Plaintiffs, | : | Class Action |
| v. | : | |
| | : | District Judge |
| GENERAL CHEMICAL CORPORATION; | : | Magistrate Judge |
| GENERAL CHEMICAL PERFORMANCE | : | |
| PRODUCTS, LLC; GENTEK, INC.; | : | **JURY TRIAL DEMANDED** |
| CHEMTRADE LOGISTICS INCOME FUND; | : | |
| CHEMTRADE LOGISTICS INC.; CHEMTRADE | : | |
| CHEMICALS CORPORATION; CHEMTRADE | : | |
| CHEMICALS US, LLC.; GEO SPECIALTY | : | |
| CHEMICALS, INC.; C&S CHEMICALS, INC.; | : | |
| USALCO, LLC; KEMIRA CHEMICALS, INC.; | : | |
| FRANK A. REICHL; BRIAN C. STEPPIG; | : | |
| VINCENT J. OPALEWSKI; and JOHN DOES | : | |
| 1-50, | : | |
| | x | |
| Defendants. | | |

<u>**INDIRECT PURCHASER PLAINTIFF'S CLASS ACTION COMPLAINT**</u>

1.      Indirect Purchaser Plaintiff, City of Homestead, Florida, by its attorneys, brings

this Class Action Complaint on behalf of itself and a class of indirect purchasers (hereinafter

referred to as the "Class" or "Class Members") who purchased liquid aluminum sulfate ("LAS"

or "alum") manufactured and supplied by Defendants General Chemical Corporation, General

Chemical Performance Products, LLC, GenTek Inc., Chemtrade Logistics Income Fund, Chemtrade Logistics Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US, LLC., GEO Specialty Chemicals, Inc., C&S Chemicals, Inc., USALCO, LLC, Kemira Chemicals, Inc., Frank A. Reichl, Brian C. Steppig, Vincent J. Opalewski, and John Does 1 through 50 (hereinafter referred to as "Defendants"), along with Defendants' co-conspirators, and sold from as early as January 1, 1997, through at least February 2011.   All allegations made in this complaint are based upon information and belief except those allegations that pertain to Plaintiff, which are based on personal knowledge.

## INTRODUCTION AND FACTUAL BACKGROUND

2.      This case arises from a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS, a coagulant used: (1) to treat drinking and waste water; (2) to alter the pH of soil; (3) to clarify and to control algae growth in lakes, ponds and other water features; (4) to fix dyes to textiles; (5) as a litter amendment for ammonia control in poultry houses; and (6) in their manufacturing of pulp and paper.  Plaintiff brings this indirect-purchaser antitrust class action against Defendants for engaging in that conspiracy to suppress and eliminate competition in the sale and marketing of LAS, by agreeing to rig bids and allocate customers for, and to raise, stabilize, and maintain the price of, LAS sold in the United States, all of which was intended to, and did, cause the Plaintiff and the other members of the Class to pay artificially inflated and supracompetitive prices for LAS.

3.      Indirect purchasers, like the Plaintiff, purchase LAS through intermediary distributors, retailers, wholesalers and chemical supply companies.

4.       LAS is usually sold to direct purchasers and distributors by the ton.  The distributor or chemical supply company may sell the LAS in smaller volumes to its customers.

2

For large indirect purchasers the distributor or chemical supply company may arrange for the product to be drop shipped to the indirect purchaser from the manufacturing plant.

5.      From as early as 1997 and continuing until February 2011 (the "Class Period"), Defendants and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of LAS by agreeing to fix, stabilize, and maintain the price of LAS sold to direct purchasers and distributors in the United States.

6.      By agreeing not to disturb each other's "historical" business, Defendants and their co-conspirators cheated purchasers out of competitive prices for LAS.

7.      On October 27, 2015, Defendant Frank A. Reichl ("Reichl"), a former executive of General Chemical Corporation, pled guilty for his role in the conspiracy, and admitted to agreeing not to compete for contracts for LAS.  *See United States v. Frank A. Reichl*, No. 2:15-cr-00554- JLL, Dkt. No. 5 (D.N.J. Oct. 27, 2015).

8.      Reichl and his co-conspirators met to discuss each other's LAS business and discussed prices to be quoted or bid to customers. Reichl is the first person to plead guilty to participating in this decade-and-a-half-long conspiracy.

9.      In a press release dated October 27, 2015, then Assistant Attorney General Bill Baer of the Justice Department's Antitrust Division (the "DOJ") stated, "By agreeing not to disturb each other's 'historical' business, Reichl and his co-conspirators cheated municipalities and paper companies out of competitive prices for their supplies of liquid aluminum sulfate, a key water treatment chemical."

10.      In the same press release, Special Agent in Charge, Richard M. Frankel, of the FBI's Newark Division stated, "Reichl and his co-conspirators colluded to circumvent

competitive bidding and independent pricing for liquid aluminum sulfate contracts, and conspired to raise prices by submitting artificially inflated bids to their customers. …. They also allocated customers in furtherance of their collusive scheme."

11.     On February 17, 2016, an indictment was filed in the District of New Jersey by the Department of Justice alleging that Vincent J. Opalewski, a high level employee of Defendant General Chemical Corporation, and Brian C. Steppig, a high-level employee of Defendant GEO Specialty Chemicals, conspired to suppress and eliminate competition by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of LAS sold in the United States.  The indictment of Opalewski and Steppig asserts that their involvement in the conspiracy continued "until approximately February 2011."  *See United States v. Vincent J. Opalewski and Brian C. Steppig*, No. 2:16-cr-00065-JLL, Dkt. No. 1 (D.N.J. Feb. 17, 2016).

12.     The combination and conspiracy engaged in by Defendants and co-conspirators violated the antirust and/or consumer protection statutes, as well as the common law principle of unjust enrichment, of the following jurisdictions: Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class

are citizens of a state different from at least one of the Defendants.  This Court also has supplemental jurisdiction over the Class Members' state law claims under 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. §§ 1391(b) and (c), because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

15.     This Court has *in personam* jurisdiction over each of the Defendants because they either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of LAS throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  The Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

16.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

17.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of interstate commerce.

4541921_1.docx

18.     The Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class.  The Defendants directly and through their agents, engaged in activities to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for LAS, which conspiracy unreasonably restrained trade and adversely affected the market for LAS.

19.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who indirectly purchased LAS, including Plaintiff and the Class.

## PLAINTIFF

20.     Plaintiff City of Homestead, Florida ("Homestead" or "Plaintiff") is a Florida municipality located in Miami-Dade County, Florida.  During the Class Period, Homestead indirectly purchased, not for resale, LAS, which was produced by one or more of the Defendants.  Homestead primarily purchased LAS for purposes of wastewater treatment.  As a result of the Defendants' conduct alleged herein, the prices Homestead paid for LAS were greater than the prices it would have paid in the absence of Defendants' unlawful conduct alleged herein.  Homestead has therefore been injured by reason of Defendants' antitrust and consumer protection law violations.

## DEFENDANTS

21.     Defendant General Chemical Corporation ("General Chemical"), is a Delaware corporation with its principal place of business at 90 E. Halsey Road, Suite 301, Parsippany, New Jersey 07054. General Chemical manufactures a broad line of organic and inorganic chemicals for a wide variety of industries and applications, including LAS for water treatment and other applications.

22.     Chemtrade Logistics Income Fund ("CLIF"), located at 155 Gordon Baker Road, Suite 300 Toronto, Ontario, Canada M2H 3N5, is a Canadian provider of industrial chemicals and services to customers in North America and around the world. Defendants Chemtrade Logistics Income Fund; Chemtrade Logistics Inc.; Chemtrade Chemicals Corporation; and Chemtrade Chemicals US, LLC (collectively "Chemtrade") absorbed General Chemical, and assumed all rights and obligations of General Chemical.  As the legal successor in interest to General Chemical, Chemtrade assumed the liability of damages caused by General Chemical's participation in the conspiracy to fix prices and rig bids. Defendant Chemtrade's acquisition of General Chemical was transformational for Chemtrade.  After absorbing General Chemical, Chemtrade has a market capitalization of close to $700 million and provides industrial chemicals and services to customers in North America and globally.

23.     Upon information and belief, Defendant General Chemical Performance Products LLC, was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.

24.     Upon information and belief, Defendant GenTek, Inc. ("GenTek"), a publicly traded company, is a corporation existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. General Chemical was a wholly owned and controlled subsidiary by GenTek from approximately 1999 to approximately October 2009. At all relevant times, as General Chemical's parent company, GenTek was fully aware of General Chemical's role and participation in its unlawful price-fixing conspiracy as described herein.

a.     Around October 11, 2002, GenTek filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy

filings on behalf of its subsidiaries, including General Chemical Corporation.  Effective October 7, 2003, GenTek and General Chemical Corporation were discharged from bankruptcy under a plan of reorganization.  GenTek and General Chemical Corporation participated in the conspiracy alleged herein throughout the Class Period through the actions of many of GenTek's and General Chemical's senior executives.

b.   After their discharge from bankruptcy, GenTek and General Chemical reaffirmed their participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to LAS.  Specific postdischarge actions taken by GenTek and General Chemical in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all of the Defendants, GenTek, and General Chemical throughout the Class Period.

c.   Regardless of whether GenTek and General Chemical participated in the conspiracy throughout the Class Period or joined and/or reaffirmed membership in the conspiracy immediately after their discharge from bankruptcy, this complaint seeks to recover damages from GenTek and General Chemical only for GenTek's and General Chemical's postdischarge conduct, and in no way seeks to violate any orders of the Bankruptcy Court.  GenTek's and General Chemical's postdischarge conduct, however, renders them jointly and severally liable for all damages resulting from the conspiracy during the entire class period. Thus, by operation of law, the damages arising from GenTek's and General Chemical's postdischarge conduct includes damages incurred by Plaintiff and the Class prior to GenTek's and General Chemical's discharge from bankruptcy.  This complaint also seeks to recover damages from the remaining Defendants for GenTek's and General Chemical's predischarge conspiratorial conduct.

Therefore, Plaintiff pleads only a single class period as to all Defendants, but damages as to GenTek and General Chemical are governed by the principles of conspiracy law and joint and several liability as noted above.

25.     Defendant C&S Chemicals, Inc. ("C&S") is a privately held Pennsylvania corporation with it principal place of business at 4180 Providence Road, Marietta, Georgia. C&S Chemicals, Inc. specializes in the production of LAS and sodium aluminate and currently operates six manufacturing facilities in Florida, Georgia, South Carolina, Illinois, and Minnesota. During the Class Period, directly or through its subsidiaries and affiliates, C&S Chemicals, Inc. sold LAS throughout the United States.

26.     Defendant GEO Specialty Chemicals ("GEO Specialty") is a privately held Ohio corporation with its corporate headquarters in Ambler, Pennsylvania, and its corporate finance headquarters in Lafayette, Indiana. During the Class Period, directly or through its subsidiaries and affiliates, GEO Specialty Chemicals sold LAS throughout the United States.

a.     Around March 18, 2004, GEO Specialty filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.  Effective December 20, 2004 GEO Specialty was discharged from bankruptcy under a plan of reorganization.  GEO Specialty participated in the conspiracy alleged herein throughout the Class Period through the actions of many of GEO Specialty's senior executives.

b.     After its discharge from bankruptcy, GEO Specialty reaffirmed its participation in the conspiracy, in part by continuing to engage in the conduct described herein with respect to LAS.  Specific postdischarge actions taken by GEO Specialty in furtherance of the conspiracy are alleged herein and are consistent with the actions taken by all of the Defendants and GEO Specialty throughout the Class Period.

9

c.    Regardless of whether GEO Specialty participated in the conspiracy throughout the Class Period or joined and/or reaffirmed membership in the conspiracy immediately after its discharge from bankruptcy, this complaint seeks to recover damages from GEO Specialty only for GEO Specialty's postdischarge conduct, and in no way seeks to violate any orders of the Bankruptcy Court.   GEO Specialty's postdischarge conduct, however, renders it jointly and severally liable for all damages resulting from the conspiracy during the entire class period. Thus, by operation of law, the damages arising from GEO Specialty's postdischarge conduct includes damages incurred by Plaintiff and the Class prior to GEO Specialty's discharge from bankruptcy. This complaint also seeks to recover damages from the remaining Defendants for GEO Specialty's predischarge conspiratorial conduct.   Therefore, Plaintiff pleads only a single class period as to all Defendants, but damages as to GEO Specialty are governed by the principles of conspiracy law and joint and several liability as noted above.

27.    Defendant USALCO, LLC ("USALCO") is a privately held Maryland corporation with its principal place of business at 2601 Cannery Avenue, Baltimore, Maryland.  USALCO manufactures and distributes aluminum-based chemical products, including LAS, to the industrial and municipal markets in the United States.  In November 2011, USALCO acquired the assets of another LAS producer, Delta Chemical.  USALCO has manufacturing facilities in Indiana, Louisiana, Maryland, and Ohio.  During the Class Period, directly or through its subsidiaries and affiliates, USALCO sold LAS throughout the United States.

28.    Kemira Chemicals, Inc. ("Kemira") is a publicly held Georgia corporation with its principal place of business at 1000 Parkwood Circle, Suite 500, Atlanta, Georgia.  Kemira Chemicals is a subsidiary of Kemira Oyj, a Finish company with its principal place of business

in Helsinki, Finland. Kemira Chemicals is the successor company to Kemiron Companies, Inc. Kemira Chemicals maintained a 60% ownership interest in Kemiron Companies, Inc. prior to May 2005,[1] but Kemira Chemicals purchased the remaining 40% shares in May 2005. Kemira Chemicals manufactures, formulates, and supplies specialty and process chemicals for paper, water treatment, mineral slurries, and industrial chemical industries in North America and internationally. Kemira Chemicals has water treatment chemical manufacturing facilities in Alabama, California, Florida, Georgia, Kansas, Missouri, North Carolina, Ohio, Texas, and Washington. During the Class Period, directly or through its subsidiaries and affiliates, Kemira Chemicals sold LAS throughout the United States.

29.     Defendant Frank A. Reichl is a resident of Flanders, New Jersey. At all relevant times, Reichl actively conspired with Defendants and co-conspirators in their unlawful price-fixing conspiracy. On October 27, 2015, Reichl pleaded guilty for his role in the conspiracy as described herein.

30.     Defendant Brian C. Steppig was at all relevant times employed by Defendant GEO Specialty Chemicals and held the following positions in which he was responsible for the sale and marketing of LAS: from approximately 1997 to 2006, he was the manager of pulp and paper, water treatment chemicals; and from 2006 to at least 2011, he was the director of sales, water treatment chemicals.

31.     Defendant Vincent J. Opalewski was at all relevant times employed by Defendant General Chemical and/or Defendant GenTek, and held the following positions in which he was responsible for the sale and marketing of LAS: from approximately 2005 to 2006, he was vice

---

[1]Kemiron Chemicals, Inc. began business in 1992 and was founded by Lawrence Hjersted. Kemiron Chemicals was headquartered in Bartow, Florida and was one of the largest manufacturers of aluminum-based chemicals in North America. Hjersted sold his remaining ownership interest in Kemiron Chemicals, Inc. to Kemira Chemicals in May 2005.

11

president of sales and marketing; from approximately 2006 to 2009, he was vice president and general manager; and from approximately 2009 to 2011, he was president.

32.     Upon information and belief, Defendants John Does 1 through 50 are corporations and/or entities whose true names and capacities, or otherwise, are unknown to Plaintiff. Therefore, Plaintiff sues such John Does 1 through 50 by such fictitious names. Further, upon information and belief, Plaintiff alleges that each of the fictitiously named Defendants is in some manner responsible for the events alleged herein and that Plaintiff's damages were proximately caused by such John Doe Defendants.

33.     Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees, or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs.

## AGENTS AND CO-CONSPIRATORS

34.     Various persons that are not named as Defendant have participated as coconspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged antitrust conspiracy and the anticompetitive and anticompetitive agreements addressed in this lawsuit. Plaintiff reserves the right to name some or all of these entities as a Defendant at a later date.

35.     On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiff, are co-conspirators with Defendants in their unlawful restraints of trade.

## BACKGROUND OF THE LIQUID ALUMINUM SULFATE INDUSTRY

36.     Liquid aluminum sulfate or alum is a water treatment chemical that removes impurities and other substances from water.  Alum is the salt of sulfuric acid and aluminum

12

hydroxide known by its chemical name $Al_2(SO_4)_3$.  In its most common uses in the water treatment and paper industries, Alum is a source of A13+, which is a highly charged ionic "species" that attracts negative particles, such as those that discolor raw water supplies, reacts with those negative particles, and then precipitates those participles out of the solution as ionic solids.  *See* Donaldson, Lisa, FERNZ Chemicals NZ Ltd.

37.     Put more simply, LAS aggregates small particles into larger particles that then fall to the bottom of a holding container or natural structure.

38.     LAS is used for a variety of purposes including in water treatment and purification as a coagulant to remove suspended solids and thus speed up the filtration process; in wastewater treatment for clarification and phosphorous removal; in ornamental lakes and ponds for algae control; in fixing dyes to fabrics and textiles, in synthetic catalyst production; in poultry houses as a litter amendment for ammonia control; and in paper mills to remove impurities from the water used to make paper and in the pulp of paper itself to help bind materials, neutralize charges and in rosin sizing.

39.     LAS has achieved wide use by municipalities, in part, because it is considerably safer and easier to use than alternatives like anhydrous ammonia or aqueous ammonia.

40.     With particular regard to the treatment of municipal waste water, LAS helps municipalities comply with environmental regulations concerning total organic carbon, turbidity, and phosphorus effluent discharge levels.

41.     Similarly, water treatment service providers purchase LAS to reduce phosphorous that can accumulate in ornamental lakes due to surface runoff.  This use is partially driven by environmental regulations requiring the reduction of phosphorus levels in surface water.

13

## THE NATURE OF THE LIQUID ALUMINUM SULFATE
## INDUSTRY MAKES IT SUSCEPTIBLE TO COLLUSION

42.     The market for LAS is characterized by factors that increased its susceptibility to collusion during the Class Period.  These factors include: the commodity-like nature of LAS, the low level of market growth characteristic of a mature market, the announcement of nearly simultaneous price increases by Defendants in spite of steady or declining costs, the presence of high barriers to market entry, and the high level of market concentration.

**Liquid Aluminum Sulfate Is A Commoditized Product**

43.     When a product is characterized as a commodity, market participants compete principally on the basis of price rather than other attributes such as product quality.  The presence of this factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.  Research conducted by industry analysts and leading manufacturers indicates that LAS is a commodity product and competition in the market is driven principally by price.

44.     A 2006 report noted the increased commoditization of LAS and other chemicals in the North American water treatment market.  A 2009 report by the Water Research Foundation stated "[a]lum is a commodity chemical."  More recently, a 2012 analyst report described inorganic coagulants such as Alum as "commodity chemicals that are relatively easy to manufacture."  A 2015 analyst report noted that the water management chemicals market is split into two major categories: specialty chemicals and "[c]ommodity chemicals such as alum."

14

**Demand Growth Was Weak During The Class Period**
**Because The Market For Liquid Aluminum Sulfate Is Mature**

45.     In mature industries, firms' ability to increase sales is limited to population growth and the replacement of existing products.  This means that slow growth rates often exist in mature industries because new distribution channels which might raise sales have typically been exhausted.  Consequently, the only way for firms in operating in mature industries, where demand growth is slow, to capture additional market share is by competing with each other on the basis of price.  This factor is exacerbated in industries for commodity products, such as LAS, since product differentiation would not be an alternative way to gain market share.

46.     Kemira's parent company in its 2008 annual report described demand as follows: "Only modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."

47.     One 2001 article described the aluminum sulfate market as "very mature, with a projected annual growth rate of roughly 2 percent."  A 2004 Chemical Market Reporter article noted that aluminum sulfate is a mature commodity market.  Similarly, a 2015 analyst report notes that the "technologies currently used in water treatment are mature."  As a mature market, future sales of Alum are determined by population growth.  In its 2013 annual report, Chemtrade Logistics, which acquired General Chemical in 2014, noted that the "North American market for water treatment chemicals generally tracks GDP and population growth."

48.     A 2003 article in ICIS included an interview with General Chemical's Marketing Manager Karla Doremus-Tranfield, noting "[t]he Alum market is generally balanced, 'No new suppliers have come into the marketplace, and its end users are well understood . . . And it's a mature market, one of the most mature,' she adds, noting that ancient Egyptians used alum."

15

**Liquid Aluminum Sulfate Prices Increased Despite Stable Or Declining Costs**

49.      A similar indicia of a pricing conspiracy is the fact that LAS prices increased in an environment where its input costs either declined or held steady during the Class Period.  The cost of bauxite ore, which is used to produce aluminum trihydrate, a primary input for LAS, declined almost 50% during the period from 1991 to 2003.  From 2003 to 2007, bauxite ore costs rose around $6 per ton, but leveled off and declined slightly by the end of 2007.  From 2008 to 2010, bauxite ore costs declined a further $3-$4 per ton.

50.      Further, the cost of sulfuric acid, another main component used in LAS production, was relatively stable from 1997 to 2007. After a brief spike in 2008, sulfuric acid costs began to fall in early 2009, leveling off at historic lows for the remainder of 2009 and 2010.

51.      Despite generally stable or falling input costs, LAS prices increased significantly during the early part of the Class Period.  Per the Chemical Market Reporter (now "ICIS"), from 1998 to 2004, LAS prices increased approximately 33.8% to 38%, while prices for dry aluminum sulfate increased approximately 220% to 236%.   During this period, ICIS publicly reported numerous examples of parallel price increases by Defendants.  For example:

a.      General Chemical and GEO announced identical Alum price increases of $15 per ton on August 10 and August 31, 1998.

b.      General Chemical and GEO announced identical Alum price increases of $15 per ton on October 4 and October 18, 1999.

c.      Southern Ionics, GEO, and General Chemical announced Alum price increases of $8-$9 per ton around December 2000.

d.      Kemiron Companies, General Chemical, and GEO announced identical Alum price increases of $10 per ton between November 21 and December 12, 2003.

16

e.   USALCO and General Chemical both announced Alum price increases effective December 1, 2004, which were subsequently reported by ICIS on December 3, 2004.

52.   A 2009 report by the Water Research Foundation analyzed a survey about the rising costs of water treatment chemicals during the period between January of 2008 and January of 2009 that was administered by the Association of Metropolitan Water Agencies and to which forty-seven United States drinking water utilities responded.   Twenty-five of those entities reported using Alum and, during the period of that single year, reported an average 53% price increase, with maximum increases being as high as 168%.   While raw material cost increases were cited as a major cause of these increases, as noted above, the report noted the "boom" in commodities prices was over by mid-2008.

53.   As GenTek reported in its 2009 Form 10-K for the year, price increases on products such as LAS contributed significantly to the profits earned by GenTek on successful bids or responses to RFPs in the water treatment market[2]: "[s]ales into the water treatment market increased by $67 million [$482 million in 2008, as opposed to $397 million in 2007] driven by $59 million resulting from increases in selling prices. . . . "

54.   The marked rise of LAS prices in the midst of falling or steady input costs supports the conclusion that Defendants' illegal conspiracy resulted in Plaintiff and Class Members paying artificially-inflated prices.

---

[2]On information and belief, municipalities primarily procured LAS through a bidding process while paper companies and distributors primarily utilized the RFP or Request For Proposal process.

17

**The Liquid Aluminum Sulfate Market Has High Barriers to Entry**

55.    High barriers to entry constitute a third factor which increased the likelihood of anti-competitive conduct in the LAS market.  There are significant barriers to entry which have prevented potential competitors from effectively competing in the U.S. Alum market during the Class Period.  An August 2009 article in *WaterWorld* noted that "[t]he North American water treatment chemicals market is mature with high entry barriers."  These barriers include production, manufacturing, and transportation costs, as well as satisfaction of regulatory requirements.  High barriers to entry also exist because only a determined competitor with specialized technical knowledge, the capital necessary to build costly manufacturing facilities, and access to distribution channels could have competed in this market.

56.    On information and belief, the Alum market had no new entrants during the Class Period.  In 2003, General Chemical's Marketing Manager Karla Doremus-Tranfield noted that no new suppliers have come into the marketplace. Since 2010, the only significant new entrant in the Alum industry is Affinity Chemical LLC. Affinity Chemical LLC was formed in 2011 by Reichl, who agreed to plead guilty to price fixing Alum on October 27, 2015.

**The Liquid Aluminum Sulfate Market is Highly Concentrated**

57.    Defendants are the major water treatment chemicals manufacturers in North America, including the United States, and altogether they control and share a majority of the market for LAS.  Moreover, the industry experienced heavy consolidation in the period leading up to and including 1997.  The concentration of the industry was also enhanced throughout the Class Period by agreements among Defendants to distribute one another's products.  Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market such

18

as LAS in the United States also facilitates the formation of collusion among purported competitors.

58.    As noted in the indictments of Opalewski and Steppig, and the Criminal Information against Reichl, there were countless opportunities for Defendants to communicate and conspire with each other and their co-conspirators. Defendants and their co-conspirators regularly met and discussed each other's business, entered into "not-to-compete" agreements, allocated customers and submitted artificially inflated bids.  *See* Criminal Information ¶ 13, *United States v. Frank A. Reichl*, 2:15-cr-00554 (D.N.J.); Indictment ¶ 16, *United States v. Vincent J. Opalewski and Brian C. Steppig*, No. 2:16-cr-00065 (D.N.J.).

## ONGOING DOJ INVESTIGATION, INDICTMENTS, AND GUILTY PLEA

59.    On March 4, 2014, Defendant CLIF issued an Annual Information Form or AIF pursuant to the Canadian securities laws.  The AIF covered calendar year 2013, which is the year that the fund commenced its acquisition of Chemtrade/General Chemical.  In explaining the legal and regulatory risk factors confronting the fund, the AIF stated that:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry.  **Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty and a leniency "marker" from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals** under investigation which General Chemical had obtained prior to the General Chemical Acquisition. The investigation may result in separate civil litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time.  Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation.  (emphasis added).

60.     One year later, CLIF issued its Annual Information Form for calendar year 2014, which again noted that it was cooperating with the Department of Justice and that it had "the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals."

61.     According to the Frequently Asked Questions Regarding the Antitrust Division's Leniency Program page maintained by the U.S. Department of Justice, a grant of conditional leniency as claimed by Defendant CLIF indicates that CLIF had admitted to a ***criminal*** violation of the antitrust laws.  The FAQ continues to state that, "Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program." (https://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program (last visited April 11, 2016)).

62.     On October 27, 2015, Reichl, a former executive of General Chemical and the founder of Affinity Chemical pleaded guilty for his role in the conspiracy.

63.     Based on information contained in the court filings made by the U.S. Department of Justice, Antitrust Division, and additional research, Reichl was an employee of General Chemical Corp., where he held positions as General Manager and V.P. of Marketing & Sales and, thus, oversaw the sale and marketing of LAS.  During his employment at General Chemical, Reichl was responsible for pricing and strategy, analyzing proposals, determining prices approving bid and price proposals, and supervising other sales and marketing employees of General Chemical.

64.     As noted in a 2008 filing by GenTek, "Reichl [] reports directly to VP/GM of General Chemical, Opalewski.  Opalewski makes a recommendation to the CEO who uses the

20

information provided by him to determine Mr. Reichl's base salary and appropriate amounts of variable cash and stock based incentive compensation consistent with the information and factors discussed above."  As such, Opalewski was knowledgeable of the business activities engaged in by Reichl and participated, authorized, knew, and/or should have known of the illegal activities to which Reichl has now agreed to plead guilty.

65.    Based on information contained in the court filings made by the U.S. Department of Justice, Antitrust Division, Reichl and his co-conspirators met to discuss each other's LAS business, submitted intentionally losing bids to favor the intended winner of the business, withdrew inadvertently winning bids and discussed prices to be quoted or bid to customers.

66.    By agreeing to violate both the spirit and the letter of the competitive process, Reichl and other Defendants defrauded direct and indirect purchasers of LAS out of many millions of dollars.

67.    The ongoing investigation into collusion in the LAS market is being conducted by the Antitrust Division's New York Office and the FBI's New Jersey Office.

68.    On February 17, 2016, the Antitrust Division of the Department of Justice filed an Indictment in the District of New Jersey, which detailed charges against Opalewski and Steppig. The indictment contains detailed allegations that Opalewski and Steppig conspired to suppress and eliminate competition "by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of LAS sold to municipalities and pulp and paper companies in the United States."

69.    Opalewski is identified in the indictment as an employee of "Company 1," a Delaware corporation with its headquarters in Parsippany, New Jersey that manufactured and supplied water treatment chemicals, including LAS.  Plaintiff is informed and believes that

"Company 1" is Defendant General Chemical, and so alleges.  The indictment further states that Opalewski held the positions of "vice president of sales and marketing," "vice president and general manager," and "president" of Company 1 during the relevant time period.  Opalewski is alleged to have participated in the conspiracy from "at least as early as 2005 continuing until approximately February 2011."

70.     Steppig is identified in the indictment as an employee of "Company 2," an Ohio corporation with operations in Lafayette, Indiana that manufactured and supplied water treatment chemicals, including LAS.  Plaintiff is informed and believes that "Company 2" is Defendant GEO Specialty Chemicals, and so alleges.  The indictment further states that Steppig held the positions of "manager of pulp and paper, water treatment chemicals" and "director of sales and marketing, water treatment chemicals" of Company 2 during the relevant time period.  Steppig is alleged to have participated in the conspiracy from "at least as early as 1998 and continuing until approximately February 2011."

## METHODS AND MEANS OF CARRYING OUT THE CONSPIRACY

71.     Defendants and their co-conspirators engaged in activities to carry out the anticompetitive conspiracy, including, among other things:

a.     Participating in meetings and conversations to discuss each other's LAS business;

b.     Agreeing to fix, stabilize and maintain the price of LAS sold in the United States;

c.     Agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

d.     Tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of LAS, so as to

22

determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

e.    Submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" LAS customers;

f.    From time to time, discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw  away" bid or price quotation;

g.    From time to time, upon request of a co-conspirator, withdrawing inadvertently winning bids submitted to co-conspirators' "historical" customers;

h.    Where a co-conspirator could not withdraw its inadvertently winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

i.    Instructing new employees as to how to determine whether and how to bid on or quote a price for the business of LAS customers so as to comport with the agreement not to compete between the defendants and co-conspirators.

72.    Defendants acted in conformance with the conduct described in the Reichl Criminal Information and the Opalewski/Steppig indictments on numerous occasions since at least 1997.

73.    Paragraph 13(b) of the Reichl Criminal Information and paragraph 16(b) of the Opalewski/Steppig indictments state that Reichl, Opalewski, Steppig and their co-conspirators combined and conspired to stay away from each other's historical customers by not pursuing the business of those customers.  A few examples of such conduct during the Class Period include:

a.     When Bellingham, Washington, solicited bids from seven companies for the 2006 calendar year, only General Chemical responded.  General Chemical had also been the bid winner in 2004 and 2005.  From 2004 to 2006, General Chemical's price to Bellingham increased from $198.54 per ton to $280.49 per ton, an increase of 41% in only two years, during a period in which input costs for Alum were stable.

b.     When Pittsburg, California, put out bid requests in both 2008 and 2009 for Alum, General Chemical's was the sole bid received despite the City's efforts to send bid requests to 13 other vendors.  Between 2007 and 2008, General Chemical increased the price charged to Pittsburg 60%, and represented to the city that the price increases were due to increased worldwide competition and fuel and energy cost used to manufacture and transport the chemicals in large quantities.

c.     When in 2009, the City of Frankfort, Kentucky, received no responses to its request for bids, so was forced to purchase Alum from General Chemical which indicated it was "the regional Liquid Alum distributor for th[e] area."

74.     Paragraphs 13(c)-(d) of the Reichl Criminal Information and paragraph 16(c)-(d) of the Opalewski/Steppig indictments state that Reichl, Opalewski, Steppig and their co-conspirators conspired to intentionally submit losing, throw-away bids or price quotes to each other's historical customers.

75.     Numerous purchasers have received bids or price quotes where there are significant differences between the losing and winning bids or price quotes indicating that the non-incumbent provider is submitting a throw-away bid or price quote.  For example:

a.     In March 2005, USALCO entered into a three-year contract with Grand Rapids, Michigan, at a price of $149.52 per ton.  The only other two bidders were

General Chemical and C&S Chemical, which submitted bids of $186.94 and $232, or 25% and 55% higher than the winning bid, respectively.

b.    In October 2008, General Chemical received a contract with Fayetteville, Arkansas, at a price of $184.20 per ton.  The second-lowest bidder was C&S Chemical, with a bid of $247.60 per ton, or 34.4% higher than General Chemical's bid. Similar, the only two other bidders — Kemira and GEO Specialty — bid 37% and 43% higher, respectively.

c.    In May 2009, General Chemical received a contract with Milwaukee, Wisconsin, at a price of $429 per ton.  The only other bidder, USALCO, submitted a bid of $562 per ton, or 31% higher than General Chemical's winning bid.

d.    In June 2010, General Chemical received a contract to supply Pensacola, Florida, at a price of $212.93 per ton. While the second-lowest bidder, a small regional producer named Southern States, submitted a bid of $219 per ton, the other large national Alum producers, GEO Specialty and C&S Chemical, bid prices which were an astounding 117.7% and 162% higher than General Chemical's winning bid.

76.    Paragraph 13(f) of the Reichl Criminal Information and paragraph 16(f) of the Opalewski/Steppig indictment states that Reichl, Opalewski, Steppig and their co-conspirators conspired to withdraw inadvertently winning bids or price quotations to co-conspirators' historical customers.  Examples of such withdrawn bids include:

a.    In December 2005, General Chemical submitted the winning bid for a one-year supply contract for the City of Rochester, Minnesota.   General Chemical's winning bid was then withdrawn, leaving C&S Chemical as the winning bidder for the 2006 calendar year.

     b.    On October 6, 2009, General Chemical won a bid to supply Alum to Phenix City, Alabama.  Two weeks later, that winning bid was rescinded and the only other bidder — C&S Chemical — was awarded the contract.

77.    On information and belief, Homestead and other indirect purchasers of LAS were similarly affected by the conspiracy and its impact on the stream of commerce, in that the conspiracy among the Defendants was intended to, and did, cause Homestead and other members of the Class to pay artificially inflated and supracompetitive prices for LAS.

## CLASS ACTION ALLEGATIONS

78.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following class with respect to claims under the antirust and/or consumer protection statutes of each of the below jurisdictions and/or  under common law principles of unjust enrichment recognized in each of those jurisdictions:

> All persons or entities in Alabama, Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota,  Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North  Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West  Virginia, and Wisconsin, who indirectly purchased liquid aluminum sulfate, not for resale, which was manufactured, produced or supplied by Defendants  or their unnamed co-conspirators from January 1997 to June 2015.[3]  Excluded from the Class are Defendants, their co-conspirators, whether or not named this Complaint, and their  representatives, parents, subsidiaries and affiliates, and all federal governmental entities.

79.    Joinder of all Class members is impracticable. While the size of the Class is not yet known with certainty, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that the Class numbers in the thousands. Class members are geographically dispersed throughout the United States. There are questions of law and fact common to the Class

---

[3]Plaintiff reserves the right to amend the class period after it has obtained discovery in this action.

that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

      a.    Whether Defendants entered into a contract, combination or conspiracy to fix, raise, maintain, or stabilize LAS prices or otherwise restrain trade in the United States;

      b.    The identities of the participants in the alleged conspiracy;

      c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

      d.    Whether Defendants engaged in fraudulent concealment;

      e.    The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

      f.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to Plaintiff and other Class Members;

      g.    The appropriate injunctive and equitable relief for the Class; and

      h.    The appropriate measure of damages sustained by Plaintiff and other members of the Class.

80.    Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff and other Class Members paid artificially inflated prices for LAS that was produced, manufactured, or supplied by one or more of the Defendants and were thus injured by the same wrongful conduct of Defendants and their co-conspirators in violation of antitrust laws, and the relief sought is common to the Class.

81.    As a representative of the Class, Plaintiff will fairly and adequately protect the interests of all Class Members.

82.     Plaintiff is represented by attorneys who are competent and experienced in the prosecution of antitrust and class action litigation.

83.     The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members, including legal and factual issues related to liability and damages. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure.  Those advantages include, but are not limited to, providing Class Members with a method for redress of claims that might otherwise not warrant individual litigation.

84.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute his or her common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually.  Class treatment also eliminates the potential for inconsistent adjudications.

## PLAINTIFF AND THE CLASS SUFFERED
## ANTITRUST AND CONSUMER PROTECTION INJURY

85.     The conspiracy in this case had the following effects, among others:

a.      Price competition was restrained or eliminated with respect to LAS.

b.      The prices of LAS were fixed, raised, maintained, or stabilized at artificially inflated and supracompetitive levels; and

c.      Plaintiff and the Class were deprived of the benefits of free, open, and unrestricted competition in the market for LAS.

4541921_1.docx

86.     By reason of the alleged violations of the applicable state antitrust and consumer protection laws during the Class Period, Plaintiff and members of the Class sustained injury having paid higher prices for LAS than they would have paid in the absence of Defendants' illegal conduct, combination or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an  injury of the type that the applicable state antitrust and consumer protection laws were meant to punish and prevent.

**TOLLING OF THE STATUTE OF LIMITATIONS,
FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

87.     Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until, at the earliest, October 27, 2015, when Reichl pleaded guilty to his participation in the conspiracy and wrongful conduct. Because Defendants' agreements, understandings and conspiracy were kept secret, Plaintiff and the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for LAS.  None of the facts or information available to Plaintiff or the Class prior to October 27, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to October 27, 2015.

88.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

89.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiff and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

4541921_1.docx

90.     Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

91.     Defendants' conduct was, by its nature, self-concealing and carried out in a manner that precluded detection.  Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and actively foreclosed Plaintiff and the Class from learning of their illegal acts.

92.     By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

**FIRST CLAIM FOR RELIEF**
**<u>Violation Of State Antitrust Statutes</u>**

93.     Plaintiff incorporates by reference the preceding allegations contained in this Complaint as if fully set forth herein.

94.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§ 44-1401 *et seq*.

95.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§ 16700 *et seq.*

96.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502 *et seq*.

97.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii's Rev. Stat. §§ 480-3 *et seq.*

98.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Illinois Antitrust Code, 740 Ill. Comp. Stat. 10/7 (2).

4541921_1.docx

99.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq.*

100.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

101.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*

102.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.772 *et seq.*

103.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.51 *et seq.*

104.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Antitrust Act, Miss. Stat. §§ 75-21-1 *et seq.*

105.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

106.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

107.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.*

108.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

109.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 *et seq.*

110.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

111.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01 *et seq.*

112.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Antitrust Act, Ore. Rev. Stat. §§ 646.725 *et.seq.*

113.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1-3.1 *et seq.*

114.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*

115.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.*

116.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1 *et seq.*

117.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

**SECOND CLAIM FOR RELIEF**
**Violation Of State Consumer Protection And Unfair Competition Laws**

118.    Plaintiff incorporates by reference the preceding allegations contained in this Complaint as if fully set forth herein.

119.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.    As a direct and proximate result of Defendants'

anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and Class members were forced to pay higher prices for LAS.

120.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

**California Unfair Competition Law ("CUCL")**
**California Bus. & Prof. Code §§ 17200 *et seq.***

121.    California's Unfair Competition Law broadly bars "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

122.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

123.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

124.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of California Bus. & Prof. Code §§ 17200 *et seq.*

**Colorado Consumer Protection Act**
**("CCPA")Colo. Rev. Stat. §§ 6-1-101 *et seq.***

125.    Private actions under the CCPA are available to any person who: (a) is an actual or potential consumer and is injured as a result of deceptive trade practices; or (b) is a successor in interest to an actual consumer who purchased a defendant's goods, services, or property; or (3) was injured as a result of a deceptive trade practice while in the course of his or her business or occupation. Colo. Rev. Stat. §§ 6-1-113(1)(a)-(c).

126.    The CCPA proscribes 43 categories of deceptive trade practices, which are non-exhaustive and are to be interpreted broadly. Moreover, the listed categories are in addition

to and do not limit the types of unfair practices that may be actionable under other statutes or the common law. Colo. Rev. Stat. § 6-1-105.

127.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

128.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

129.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Colorado's Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 *et seq.*

**District Of Columbia Consumer Protection Procedures**
**Act ("DCCPPA") District Of Columbia Code §§ 28-3901 *et seq.***

130.    The stated purpose of the DCCPPA is to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices."  District of Columbia Code § 28-3901(b)(1).

131.    The DCCPPA itself lists 32 categories of deceptive trade practices, which are non-exhaustive and are to be interpreted broadly.  Moreover, the listed categories are in addition to and do not limit the types of unfair practices that may be actionable under other statutes or the common law.  District of Columbia Code §§ 28-3904(a)-(ee).

132.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

133.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

134.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of District of Columbia Code §§ 28-3901 *et seq.*

**Florida Deceptive And Unfair Trade**
**Practices Act ("FDUTPA") Florida Stat. §§ 501.201 *et seq.***

135.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

136.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

137.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.

138.     During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

139.     As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

140.     Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Fla. Stat. § 501.202(2).

**Massachusetts Consumer Protection Act**
**("MCPA") Mass. Gen. L. Ch. 93A *et seq.***

141.     The MCPA regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

142.     Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of

competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

143.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

144.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

145.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Massachusetts Gen. Laws Ann. Ch. 93A *et seq*.

146.    Plaintiff and the Class were not required to serve a demand letter to any of the Defendants in accordance with M.G.L. Ch. 93A, § 1, as none of the Defendants maintain a place of business within the Commonwealth of Massachusetts or keep assets within the Commonwealth.

**Missouri Merchandising Practices Act
("MMPA") Mo. Rev. Stat. 407.020 *et seq.***

147.    Under Section 407.020, the MMPA prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."  Mo. Rev. Stat. 407.020.

148.    The Missouri Attorney General has defined an "unfair practice" as:

any practice which . . . [o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or . . . [i]s unethical, oppressive, or unscrupulous; and ... [p]resents a risk of, or causes, substantial injury to consumers.

Mo. Att'y Gen. Reg., 15 CSR 60-8.02.

149.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

36

150.    Defendants' conduct had a direct and substantial impact on trade and commerce in Missouri.

151.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

152.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Missouri Merchandising Practices Act §407.010 et seq.

**Nebraska Consumer Protection Act
("CPA") Nebraska Rev. Stat. §§ 59-1601 _et seq._**

153.    The CPA prohibits unfair competition and deceptive trade practices generally "in the conduct of any trade or commerce."  Nebraska Rev. Stat. § 59-1602

154.    Included amongst its proscriptions are "contracts, combinations, and conspiracies in restraint of trade."  Nebraska Rev. Stat. § 59-1603.

155.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

156.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

157.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Nebraska Rev. Stat. §§ 59-1601 _et seq._

**New Hampshire Consumer Protection Act
("NHCPA") New Hampshire Rev. Stat. §§ 358-A:2 _et seq._**

158.    The NHCPA provides that it "shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce . . . "  New Hampshire Rev. Stat. § 358-A:2

159.     The NHCPA's protections extend to any unlawful "trade and commerce directly or indirectly affecting the people" of New Hampshire.   New Hampshire Rev. Stat. § 358-A:1 (II).

160.     Among its prohibitions, the NHCPA bars the "pricing of goods or service in a manner that tends to create or maintain a monopoly, or otherwise harm competition."   New Hampshire Rev. Stat. § 358-A:2(XIV).

161.     During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

162.     As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

163.     Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of New Hampshire Rev. Stat. §§ 358-A:2 *et seq.*

**New Mexico Unfair Practices Act**
**("NMUPA") New Mexico Stat. §§ 57-12-1 *et seq.***

164.     The NMUPA prohibits "unfair or deceptive trade practices," including 17 nonexhaustive instances of unfair or misleading conduct.  New Mexico Stat. § 57-12-2(D).

165.     During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

166.     As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

167.     Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of New Mexico Stat. §§ 57-12-1 *et seq.*

**New York Consumer Protection Act**
**("CPA")New York Gen Bus. Law §§ 349 _et seq._**

168.    The CPA prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service . . . "  New York Gen Bus. Law § 349(a).

169.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

170.    This conduct deceived consumers in New York State.

171.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

172.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of New York Gen Bus. Law §§ 349 _et seq._

**North Carolina Unfair And Deceptive Trade**
**Practices Act ("UDTPA") North Carolina Gen. Stat. §§ 75-1.1 _et seq._**

173.    The UDTPA bars unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.  North Carolina Gen. Stat. § 75-1.1.

174.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

175.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

176.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of North Carolina Gen. Stat. §§ 75-1.1 _et seq._

**Oregon Unfair Trade Practices Act**
**("OUTPA") Oregon Rev. Stat. §§ 646.605 _et seq._**

177.    OUTPA provides for recovery for an "ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful…"  Oregon Rev. Stat. § 646.638(1).

178.    OUTPA prohibits "unfair or deceptive conduct in trade or commerce," and provides 57 examples of such practices.  Oregon Rev. Stat. § 646.608(1).

179.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

180.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

181.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Oregon Rev. Stat. §646.605 *et seq.*

**Rhode Island Deceptive Trade Practices Act**
**("DTPA") Rhode Island Gen. Laws §6-13.1-1 *et seq.***

182.    The DTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Rhode Island Gen. Laws § 6-13.1-2.

183.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

184.    As a part of that conspiracy, Defendants misrepresented that the prices at which their LAS products were being offered were competitive and fair.

185.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

186.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

**Vermont Consumer Fraud Act**
**("CFA") Vermont Stat. tit. 9 §§ 2451 *et seq.***

187.    The CFA prohibits "unfair methods of competition in commerce and unlawful or deceptive acts or practices in commerce."  Vermont Stat. tit. 9 § 2453(a)

188.    During the Class Period, Defendants engaged in a conspiracy to suppress and eliminate competition by fixing prices, rigging bids and allocating customers for LAS.

189.    As a direct and proximate result of this conspiracy, Plaintiff and the Class were harmed by being forced to pay supracompetitive prices for LAS.

190.    Accordingly, such conduct as alleged in this Complaint falls within the prohibitions of Vermont Stat. tit. 9 §§ 2451 *et seq.*

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment And Disgorgement Of Profits**

191.    Plaintiff incorporates by reference the preceding allegations contained in this Complaint as if fully set forth herein.

192.    As a result of Defendants' wrongful conduct, Defendants were able to charge more for LAS which overpayments were made by Plaintiff and the Class.

193.    By paying more for LAS than they would have in the absence of Defendants' wrongful conduct, Plaintiff and the Class have  conferred a benefit on Defendants.

194.    Equity demands that Defendants be required to make restitution and return the overpayment to  Plaintiff and the Class.

195.    Plaintiff and members of the Class seek disgorgement of all profits resulting  from such overpayments and establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

**Unjust Enrichment: Alabama**

196.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Alabama than would have been possible absent the illegal conduct.

197.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Alabama indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Alabama was connected to and due to the increased prices paid for LAS by indirect purchasers in Alabama.

198.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

199.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of LAS to indirect purchasers in Alabama, Defendants should be ordered to make restitution for the benefit of Alabama indirect purchasers because it would allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Arizona

200.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Arizona than would have been possible absent the illegal conduct.

201.    Defendants have been enriched by revenue resulting from these unlawful overcharges for LAS.

202.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Arizona indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of

LAS to indirect purchasers in Arizona was connected to and due to the increased prices paid for LAS by indirect purchasers in Arizona.

203.    Plaintiff and Class Members have been impoverished by the overcharges for LAS resulting from Defendants' unlawful conduct.

204.    Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefit they received from Plaintiff and Class Members.

205.    Plaintiff and Class Members have no remedy at law.

206.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales of LAS to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: California

207.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in California than would have been possible absent the illegal conduct.

208.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

209.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to California indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their

sales of LAS to indirect purchasers in California was connected to and due to the increased prices paid for LAS by indirect purchasers in California.

210.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.

211.    Defendants were enriched by their illegal activities at the expense of California indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS in California at illegally inflated prices.

## Unjust Enrichment: Colorado

212.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Colorado than would have been possible absent the illegal conduct.

213.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Colorado indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Colorado was connected to and due to the increased prices paid for LAS by indirect purchasers in Colorado.

214.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from the sales to indirect purchasers in Colorado, Defendants should be ordered to make restitution for the benefit of Colorado indirect purchasers because it would allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

44

## Unjust Enrichment: District Of Columbia

215.    By engaging in the unlawful conduct alleged herein, Defendants received higher prices for their LAS that was sold to indirect purchasers in the District of Columbia than would have been possible absent the illegal conduct.

216.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

217.    Defendants have accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.

218.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to the District of Columbia indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in the District of Columbia was connected to and due to the increased prices paid for LAS by indirect purchasers in the District of Columbia.

219.    Defendants were enriched by their illegal activities at the expense of the District of Columbia indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of the District of Columbia indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Florida

220.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Florida than would have been possible absent the illegal conduct.

4541921_1.docx

221.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

222.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Florida indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Florida was connected to and due to the increased prices paid for LAS by indirect purchasers in Florida.

223.    Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

**Unjust Enrichment: Hawaii**

224.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Hawaii than would have been possible absent the illegal conduct.

225.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

226.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Hawaii indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Hawaii was connected to and due to the increased prices paid for LAS by indirect purchasers in Hawaii.

46

227.    Defendants were enriched by their illegal activities at the expense of Hawaii indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Hawaii indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Idaho

228.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Idaho than would have been possible absent the illegal conduct.

229.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Idaho indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Idaho was connected to and due to the increased prices paid for LAS by indirect purchasers in Idaho.

230.    Defendants were enriched by their illegal activities at the expense of Idaho indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Idaho indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Illinois

231.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Illinois than would have been possible absent the illegal conduct.

232.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

233.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Illinois indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Illinois was connected to and due to the increased prices paid for LAS by indirect purchasers in Illinois.

234.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.

235.    Defendants were enriched by their illegal activities at the expense of Illinois indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Illinois indirect purchasers because it would be against equity, justice, and good conscience to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

**Unjust Enrichment: Iowa**

236.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Iowa than would have been possible absent the illegal conduct.

237.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Iowa indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Iowa was connected to and due to the increased prices paid for LAS by indirect purchasers in Iowa.

238.    Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of

48

Iowa indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Kansas

239.     By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Kansas than would have been possible absent the illegal conduct.

240.     Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

241.     Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.

242.     The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Kansas indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Kansas was connected to and due to the increased prices paid for LAS by indirect purchasers in Kansas.

243.     Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Maine

244.     By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Maine than would have been possible absent the illegal conduct.

245.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

246.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.  Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiff and Class Members.

247.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Maine indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Maine was connected to and due to the increased prices paid for LAS by indirect purchasers in Maine.

248.    Defendants were enriched by their illegal activities at the expense of Maine indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Maine indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

**Unjust Enrichment: Massachusetts**

249.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Massachusetts than would have been possible absent the illegal conduct.

250.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

251.    Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiff and Class Members.

50

252.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Massachusetts indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Massachusetts was connected to and due to the increased prices paid for LAS by indirect purchasers in Massachusetts.

253.    Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust and unfair to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Michigan

254.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Michigan than would have been possible absent the illegal conduct.

255.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

256.    Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff and Class Members.

257.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Michigan indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Michigan was connected to and due to the increased prices paid for products containing LAS by indirect purchasers in Michigan.

258.     Defendants were enriched by their illegal activities at the expense of Michigan indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Michigan indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Minnesota

259.     By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Minnesota than would have been possible absent the illegal conduct.

260.     Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiff and Class Members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiff and Class Members.

261.     The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Minnesota indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Minnesota was connected to and due to the increased prices paid for the LAS by indirect purchasers in Minnesota.

262.     Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Mississippi

263.     By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Mississippi than would have been possible absent the illegal conduct.

264.     Defendants have retained the benefit of these overcharges, which in equity and good conscience belong to Plaintiff and the Class Members on account of Defendants' anticompetitive conduct.

265.     The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Mississippi indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Mississippi was connected to and due to the increased prices paid for LAS by indirect purchasers in Mississippi.

266.     Defendants were enriched by their illegal activities at the expense of Mississippi indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Mississippi indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

### Unjust Enrichment: Nebraska

267.     By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Nebraska than would have been possible absent the illegal conduct.

268.     Defendants received money from Plaintiffs and Class Members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.

269.     The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Nebraska indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Nebraska was connected to and due to the increased prices paid for LAS by indirect purchasers in Nebraska.

53

270.    Defendants were enriched by their illegal activities at the expense of Nebraska indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Nebraska indirect purchasers because it would be unjust and unfair to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Nevada

271.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Nevada than would have been possible absent the illegal conduct.

272.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

273.    Defendants appreciated the benefits bestowed upon them by Plaintiff and Class Members, for which they have paid no consideration to any other person.

274.    Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiff and the Class Members.

275.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Nevada indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Nevada was connected to and due to the increased prices paid for LAS by indirect purchasers in Nevada.

276.    Defendants were enriched by their illegal activities at the expense of Nevada indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: New Hampshire

277.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in New Hampshire than would have been possible absent the illegal conduct.

278.    Defendants have received a benefit from Plaintiffs in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

279.    Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

280.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to New Hampshire indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in New Hampshire was connected to and due to the increased prices paid for the LAS by indirect purchasers in New Hampshire.

281.    Defendants were enriched by their illegal activities at the expense of New Hampshire indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of New Hampshire indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: New Mexico

282.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in New Mexico than would have been possible absent the illegal conduct.

283.    Defendants have knowingly benefitted at the expense of Plaintiff and Class Members from revenue resulting from unlawful overcharges for LAS.

284.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to New Mexico indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in New Mexico was connected to and due to the increased prices paid for the LAS by indirect purchasers in New Mexico.

285.    Defendants were enriched by their illegal activities at the expense of New Mexico indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of New Mexico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices and because Defendants have paid no consideration to any other person for any of the benefits they received.

## Unjust Enrichment: New York

286.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in New York than would have been possible absent the illegal conduct.

287.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to New York indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in New York was connected to and due to the increased prices paid for LAS by indirect purchasers in New York.

288.    Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust, inequitable, and against good conscience to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

4541921_1.docx

## Unjust Enrichment: North Dakota

289.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in North Dakota than would have been possible absent the illegal conduct.

290.    Defendants have been enriched by revenue resulting from these unlawful overcharges for LAS.

291.    Plaintiff and Class Members have been impoverished by the overcharges for LAS resulting from Defendants' unlawful conduct.

292.    Defendants' enrichment and Plaintiff's impoverishment are connected. Defendants have paid no consideration to any other person for any benefit they received from Plaintiff and Class Members.

293.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to North Dakota indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in North Dakota was connected to and due to the increased prices paid for LAS by indirect purchasers in North Dakota.

294.    Defendants were enriched by their illegal activities at the expense of North Dakota indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of North Dakota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

295.    Plaintiffs and Class Members have no remedy at law.

## Unjust Enrichment: South Dakota

296.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in South Dakota than would have been possible absent the illegal conduct.

297.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

298.    Defendants were aware of the benefit bestowed upon them by Plaintiff and Class Members.

299.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to South Dakota indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in South Dakota was connected to and due to the increased prices paid for LAS by indirect purchasers in South Dakota.

300.    Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

301.    Plaintiffs and Class Members have no remedy at law.

## Unjust Enrichment: Tennessee

302.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Tennessee than would have been possible absent the illegal conduct.

303.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

304.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class Members.

305.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Tennessee indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Tennessee was connected to and due to the increased prices paid for LAS by indirect purchasers in Tennessee.

306.    Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Tennessee indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

307.    It would be futile for Plaintiff and Class Members to exhaust all remedies against the entities with which Plaintiffs and Class Members have privity of contract because Plaintiffs and Class Members did not purchase LAS directly from any Defendant.

**Unjust Enrichment: Utah**

308.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Utah than would have been possible absent the illegal conduct.

309.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

4541921_1.docx

310.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class Members.

311.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Utah indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Utah was connected to and due to the increased prices paid for LAS by indirect purchasers in Utah.

312.    Defendants were enriched by their illegal activities at the expense of Utah indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Utah indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## Unjust Enrichment: Vermont

313.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Vermont than would have been possible absent the illegal conduct.

314.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

315.    Defendants accepted the benefit bestowed upon them by Plaintiff and Class Members

316.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Vermont indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of

60

LAS to indirect purchasers in Vermont was connected to and due to the increased prices paid for LAS by indirect purchasers in Vermont.

317.    Defendants were enriched by their illegal activities at the expense of Vermont indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Vermont indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## **Unjust Enrichment: West Virginia**

318.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in West Virginia than would have been possible absent the illegal conduct.

319.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

320.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class Members.

321.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to West Virginia indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in West Virginia was connected to and due to the increased prices paid for LAS by indirect purchasers in West Virginia.

322.    Defendants were enriched by their illegal activities at the expense of West Virginia indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of West Virginia indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

61

## Unjust Enrichment: Wisconsin

323.    By engaging in the unlawful conduct in this Complaint, Defendants received higher prices for their LAS that was sold to indirect purchasers in Wisconsin than would have been possible absent the illegal conduct.

324.    Plaintiff and Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiff and Class Members.

325.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiff and Class Members.

326.    The Defendants were able to achieve their increased revenues and profits from their sale of LAS to Wisconsin indirect purchasers because the demand for LAS is relatively price inelastic, as defendants understood.  Thus, the ability of Defendants to profit from their sales of LAS to indirect purchasers in Wisconsin was connected to and due to the increased prices paid for LAS by indirect purchasers in Wisconsin.

327.    Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of LAS and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefits of their sales of LAS at illegally inflated prices.

## PETITION FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment as follows:

A.      Determining that this action may be maintained as a class action under Rule 23 of the  Federal Rules of Civil Procedure with Plaintiff as the designated Class Representative and its counsel as Class Counsel;

4541921_1.docx

B.      Enjoining Defendants from continuing to implement their unlawful agreement and ordering Defendants to take such actions necessary to remediate the market condition  that Defendants created which would allow them to maintain, or continue to increase,  prices above competitive levels;

C.      Awarding Plaintiff and the relevant Class Members compensatory damages, restitution, and/or disgorgement under the state statutes in an amount to be proven at trial, multiple damages under the state  statutes in an amount to be proven at trial, multiple damages according to law against  Defendants, jointly and severally;

D.      Awarding Plaintiff and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

E.      Awarding Plaintiff and the Class prejudgment and postjudgment interest and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.      Awarding Plaintiff and the Class their costs of suit, including reasonable attorneys' fees; and

G.      Granting Plaintiff and the Class such other and further relief as the Court deems just  and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Respectfully submitted,

**LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK,** LLP
William L. Mentlik
600 South Avenue West
Westfield, NJ
07090-1497
Tel:     908.654.5000
Fax:     908.654.7866
E-mail:wmentlik@lernerdavid.com
            litigation@lernerdavid.com

Dated: May 20, 2016                    By:     s/  William L. Mentlik

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
Jay B. Shapiro
Samuel O. Patmore
Jason P. Hernandez
Abigail G Corbett
Maria A. Fehretdinov
Molly J. Bowen
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Tel:     305.789.3200
Fax:     305.789.3395
E-mail: jshapiro@stearnsweaver.com
            spatmore@stearnsweaver.com
            jhernandez@stearnsweaver.com
            acorbett@stearnsweaver.com
            mfehretdinov@stearnsweaver.com
            mbowen@stearnsweaver.com

**MILLER LAW LLC**
Marvin A. Miller
Matthew E. Van Tine
Andrew Szot
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tel:     312.332.3400
Fax:     312.676.2676
E-mail: mmiller@millerlawllc.com
            aszot@millerlawllc.com
            mvt@millerlawllc.com

**KERGER & HARTMAN, LLC**
Richard M. Kerger
33 S. Michigan Street, Suite 100
Toledo, OH  43604
Tel:     419.255.5990
Fax:     419.255.5997
E-mail:rkerger@kergerlaw.com

4541921_1.docx

<u>**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**</u>

  The undersigned hereby certifies, pursuant to Local Civil Rule 11.2, that with respect to the matter in controversy herein, Plaintiff's attorney is aware of the following action pending in this Court:

    *In re Liquid Aluminum Sulfate Antitrust Litigation*, MDL Docket No. 2687-JLL;

    *United States of America v. Vincent J. Opalewski and Brian C. Steppig*, Crim. No. 16-65-JLL; and

    *United States v. Frank A. Reichl*, Crim. No. 15-0554-JLL


Dated: May 20, 2016      LERNER, DAVID, LITTENBERG,
                KRUMHOLZ & MENTLIK, LLP
                *Attorneys for (insert Plaintiff or Defendant)*


           By: s/  William L. Mentlik
              William L. Mentlik
              Tel: 908.654.5000
              E-mail: wmentlik@lernerdavid.com
                litigation@lernerdavid.com